To take another view of the matter, the degree or exclusiveness of appropriation accorded to the originator of a trade-name often varies with the kind of name he originates. If the name or mark be truly arbitrary, strange, and fanciful, it is more specially and peculiarly significant and suggestive of one man's goods, than when it is frequently used by many and in many differing kinds of business. Of this "Kodak" is a famous example, and the English courts have prevented one from putting forth Kodak bicycles, at the suit of the originator of the name for a totally different article. Eastman v. Kodak Cycle Co., 15 R. P. C. 105; cf. Re Dunn's Trade-Mark, 7 R. P. C. 311, and Dunlop v. Dunlop, 16 R. P. C. 12. In this court the same influence is seen in Aunt Jemima Mills Co. v. Rigney, 247 F. 407, 159 C. C. A. 461, L. R. A. 1918C, 1039, where the above line of cases is quoted and relied on.

The phrase "Gold·Medal" is distinctly not in the same class of original, arbitrary, or fanciful words as "Kodak" and "Aunt Jemima." It is a laudatory phrase, suggestive of merit, recognized by some organization of authority awarding a prize. It is only allied to some particular business or person by insistent, persistent advertising. Washburn's flour has been so advertised, and the proof is ample that publicity efforts have borne fruit, so that Gold Medal flour means among purchasers Washburn's flour. Yet it must always be remembered that there is nothing original about the name per se; it is exactly like the phrase "Blue Ribbon," and has been as extensively and variously applied. One who devises a new, strange, "catching" word to describe his wares may and often has by timely suit prevented others from taking his word or set of words to gild the repute of even wholly different goods (cases supra); but one who takes a phrase which is the commonplace of self-praise like "Blue Ribbon" or "Gold Medal" must be content with that special field which he labels with so undistinctive a name. Of this Pabst, etc., Co. v. Decatur, etc., Co. (C. C. A.) 284 F. 110, and Anheuser, etc., Co. v. Budweiser, etc., Co. (C. C. A.) 295 F. 306, constitute a perfect illustration. In the first decision Blue Ribbon was restricted to the single product with which plaintiff had associated·it, while in the second Budweiser was given a wider sphere of influence. In the present case Washburn has made known by advertising Gold Medal not a line of products, nor any product of a varied business, but one separate, well-known commod-ity, pure wheat flour, and with that he must be content.

[2] Taking still another view of the evidence, Washburn's claim is not timely; the laches, indeed the acquiescence, of so many years, while France was building up a noncompetitive business, must be given weight. Carroll v. McIlvaine, 183 F. 22, 105 C. C. A. 314, affirming 171 F. 125, is conclusive against the award of any injunction against France, and the inequity of granting such relief is too manifest for discussion.

Result is: Washburn, by persistent and pushing use of a well-known and nondistinctive name has on this record made it a good trade-mark for just what it was applied to, pure or straight wheat flour; to that commodity France never applied the name, but did apply it to a commercially distinct article as he had good right to do.

Both parties are entitled to be protected in their several businesses. France has not attacked Washburn; therefore the latter needs no relief. Washburn has deliberately attacked France; therefore the decree below was right, and is affirmed with costs.

---

## UNITED STATES v. CARGO OF LUMBER ON THE SPRINGFIELD.

(Circuit Court of Appeals, Second Circuit. May 4, 1925.)

No. 325.

Shipping ⊚⇒49(2)—Charter party for lumber, providing that any reduction in conference freight rates on lumber should apply to charter party, construed.

Charter party for carriage of lumber, providing that any reduction in North Atlantic-Pacific West-Bound Conference freight rates on lumber or its products prior to commencement of loading should apply to charter party, held to mean that lower freight rate fixed by Conference should apply, but not that charter should be Conference charges in other matters, such as amount of loading and discharging per day, on which demurrage depended, exclusion of dispatch money and brokerage.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the United States against 2,436,-567 board feet of spruce, fir, and hemlock lumber, etc., cargo lately laden on board the steamship Springfield. Libel dismissed, and the United States appeals. Affirmed.

The following is the opinion of Ward, Circuit Judge, in the court below:

"The United States, owner of the steamship Springfield, filed this libel against a cargo of lumber lately laden on board of her to recover freight at the rate of $20 per 1,000 feet board measure for lumber, 70 cents per 100 pounds for sidings, and 75 cents per 100 pounds for shingles under charter party dated September 12, 1921. It is stipulated that the freight calculated on the terms of the charter party is $50,873.11, ascertained as follows:

|  | $68,970.55 | freight |
|  | 9,221.66 | stevedoring |
| Leaving... | $59,748.89 |  |
| Subtracting | 8,013.65 | dispatch money |
| Leaves.... | $51,735.24 |  |
| Deducting.. | 862.13 | brokerage |
| Leaves net. | $50,873.11 |  |

"The answer of the claimant alleges that on October 3, 1921, before the cargo was loaded, a special meeting of the North Atlantic-Pacific West-Bound Conference promulgated Circular No. 60, fixing a rate of freight of $17 per 1,000 feet board measurement, which rate was to be substituted for the charter party rate of $20, in accordance with article X of the charter party, which reads:

" 'X. It is understood and agreed that in case any reduction shall be made in the so-called Conference freight rates on lumber and/or its products prior to the time vessel commences to load under this charter a corresponding reduction in the freight rates herein stated shall be granted to the charterer by the vessel. * * *'

"It is further stipulated that freight calculated under the charter party, with this change of freight rate only, would be $42,712.40, ascertained as follows:

|  | $60,706.53 | freight |
|  | 9,221.66 | stevedoring |
| Leaving .......... | $51,484.87 |  |
| Less dispatch money earned....... | 8,013.65 |  |
| Leaving .......... | $43,471.22 |  |
| Less brokerage.... | 758.82 |  |
| Or net balance of.. | $42,712.40 |  |

"The claimant has paid this amount into the registry of the court.

"The libelant claims that, if the changed freight rate of $17 for the $20 per 1,000 feet board measure is to be included in the charter party, then all the other provisions of Circular No. 60, such as the amount of loading and discharging per day on which

demurrage depends, the exclusion of dispatch money and brokerage, must also be included. It is stipulated that the freight so calculated would be $55,423.20, ascertained as follows:

|  | $60,706.53 | freight |
| Plus overpayment on stevedoring at loading point of.. | 445.30 |  |
| Leaving ........ | $61,151.83 |  |
| Less stevedoring at Discharge ...... | 5,728.63 |  |
| Leaving a net total of ............. | $55,423.20 |  |

with no brokerage, no demurrage, and no dispatch.

"Obviously, if Circular No. 60 is involved, the libelant cannot recover the freight sued for, which is calculated upon the terms of the charter party. But now it contends that reference to the circular discloses an ambiguity which needs explanation, for which reason it examined Mr. Sinclair, who, though not a member of the Conference, presided at the special meeting at which Circular No. 60 was adopted. He testified that the purpose of the circular was to stabilize, as far as possible, freight rates in the lumber trade. One operator might charge $20, another $18, another $17, but no one could determine what the net cost of transportation under a charter party was, without knowing, for instance, the quantity fixed in it for loading and discharging per day upon which demurrage depends. Therefore a rate of freight was named, accompanied by a fixed amount for loading and discharging per day, and other particulars, as, for instance, a maximum amount for stevedoring, if the charterer did it, and the exclusion of any allowance for dispatch or for brokerage.

"The charter party in question provided for a larger demurrage rate than did Circular No. 60, and for a less amount of loading and discharging per day; for dispatch and brokerage, which Circular No. 60 excluded; and a larger allowance to charterers for stevedoring. If the libelant's contention is correct, the charter would have to be altered in all these particulars—practically rewritten. But I discover no ambiguity to be corrected. The language is perfectly plain that, if the Conference lowered the rate of freight per 1,000 feet board measure, that rate should apply to this particular charter. There is nothing whatever to show that the parties had in mind any scheme for standardizing rates and conditions between the east and west coasts of the continent, nor, if they did, any evidence

of their intention to include such a scheme in the charter, nor any ground for extending the plain language of article X to include it.

"The libel is dismissed.

Emory R. Buckner, U. S. Atty., of New York City (Charles E. Wythe, Sp. Asst. U. S. Atty., of New York City, of counsel), for the United States.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (L. De Grove Potter, of New York City, of counsel), for appellee.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

PER CURIAM. Decree affirmed, on the opinion in the court below.

═══

## CORNELIUS v. C. C. PICTURES, Inc.

(Circuit Court of Appeals, Second Circuit. April 6, 1925.)

No. 345.

1. **Corporations ⊕⟹316(1), 545(2)—Giving of chattel mortgage by corporation to officer is viewed with suspicion, and insolvent corporation cannot pay or secure debt to director by mortgage preferring debts to others.**

While generally a director or other officer of a corporation may loan it money and obtain security for the loan by a mortgage, yet giving of such an instrument is viewed with suspicion, and an insolvent corporation cannot pay or secure a pre-existing debt due to a director, by mortgage on corporate assets, in preference to debts due others.

2. **Corporations ⊕⟹545(1)—Validity of what insolvent New Jersey corporation did for its president was to be judged by New Jersey statutes.**

Where original bill for appointment of receiver of insolvent New Jersey corporation was pending in United States District Court of that state, and proceedings in this circuit by assignee of unrecorded chattel mortgage to assert lien thereunder affecting certain property of corporation, which mortgage had been assigned to him by original mortgagee, who was the president of the corporation, were ancillary thereto, as were receivers who defended against the claim, validity of mortgage was to be judged by New Jersey statutes.

3. **Corporations ⊕⟹566(4)—Chattel mortgage, executed by corporation to secure loan, made to it by its president when it was wholly insolvent, will rank only as a general claim in distribution of corporation's assets.**

Chattel mortgage, executed by corporation to secure loan, made to it by its president, who was active manager of its affairs at a time when it was wholly insolvent, and president knew it, will rank as a general claim only in distribution of corporation's assets, in view of General Corporation Act N. J. § 64, prohibiting officers of an insolvent corporation from selling, conveying, assigning or transferring any of its estate, effects, etc.

4. **Costs ⊕⟹238(2)—Disallowance of costs on appeal is proper, where ground of affirmance was not urged below.**

Disallowance of costs on appeal is proper, where the ground on which the decision is affirmed was not urged below.

Appeal from the District Court of the United States for the Southern District of New York.

Suit by Harold C. Cornelius against the C. C. Pictures, Inc., wherein Russell G. Cornelius asserted a lien under an unrecorded chattel mortgage affecting defendant's property. From an order disallowing the claim, Russell G. Cornelius appeals. Order affirmed.

See, also, 5 F.(2d) 157.

The bill was brought by a general creditor making the usual allegations of temporary embarrassment on the part of the defendant corporation. A receiver was appointed, defendant turned out to be insolvent, and its property is in process of liquidation and distribution.

Russell G. Cornelius, appellant herein, asserted a lien under an unrecorded chattel mortgage affecting certain property of defendant, which mortgage had been assigned to him by the original mortgagee, his father, the plaintiff herein, who was at and before the time of making the mortgage the president of the defendant.

The chattels mortgaged were the same as those affected by the admittedly prior mortgage of Jacob Wener, and Wener's mortgage has been upheld in this court and its lien allowed. Opinion filed January 5, 1925 (5 F.[2d] 157). The claim of this appellant was disallowed in the court below, and he took appeal.

Finis E. Montgomery, of New York City, for appellant.

Walter D. Wile, of New York City, for receivers of defendant.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). If Cornelius had been a stranger to the defendant corporation, as was Wener, no reason appears why our decision in Wener's Case, supra, should not govern. But Cornelius was not a stranger. He was